Marie BUCKLES et al.

v.

Caspar WEINBERGER, Secretary of Health, Education and Welfare Department.

Civ. A. No. 74–2885.

United States District Court, E. D. Pennsylvania.

Aug. 1, 1975.

Linda M. Bernstein, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

Kenneth A. Ritchie, Asst. U.S. Atty., Philadelphia, Pa., Larry H. Bailine, Philadelphia, Pa., for defendant.

## OPINION

FOGEL, District Judge.

In this class action brought by Marie Buckles, Felicita Alicea, and Nicholas Smeraski, plaintiffs seek to enjoin the Secretary of Health, Education and Welfare, and his agents and delegates, from terminating their Supplemental Security Income (SSI) benefits without advance notice, and the opportunity for a hearing prior to the cessation of such payments to them.

We entered a Preliminary Injunction on December 20, 1974, 387 F.Supp. 328, and ordered the Secretary to pay SSI benefits to a class determined pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, which consisted of those persons in the Commonwealth of Pennsylvania who (1) had received SSI benefits on or after January 1, 1974, (2) had received state aid to the disabled on or before December 31, 1973, (but not before July 1, 1973), and (3) whose benefits had been, or would be

terminated, suspended, or reduced, without notice, and without being given a hearing prior to any termination, suspension or reduction of payments to them.

On January 28, 1975, defendant petitioned the Court to modify the Preliminary Injunction in order to limit the class that had been previously determined to those persons who had already filed or would file a timely request for reconsideration and a hearing pursuant to 20 C.F.R., Part 416, Subpart N, or whose time limit for filing such request for reconsideration and/or a hearing had not expired at the time of the entry of the Preliminary Injunction. We denied this motion without prejudice to defendant's right to seek modification of the class in conjunction with the final order to be entered in this matter.

All parties have agreed that a final determination may be made on the basis of the record developed at the hearing before us on December 18, 1974, which includes the Stipulation presented to the Court on that date, and the memoranda and supplementary materials filed thereafter at our request. Upon consideration of this augmented record, we conclude that a permanent injunction should issue in favor of plaintiffs and the class which they represent.

We shall discuss the issues presented by this controversy in the following order: (1) the legislative and administrative history of the SSI program; (2) the factual basis for plaintiffs' claims; (3) the merits of the case under the due process clause of the Fifth Amendment; (4) the statutory authority to make payments after December 31, 1974; and (5) the form and effect of the final injunction we will enter.

1. *The legislative and administrative history of the SSI program.*

Because the subject matter of this action has been frequently litigated in the

District Courts,[1] we shall limit our discussion to a broad outline of the SSI program.

It was enacted by Congress in October of 1972, Pub.L. 92–603, 86 Stat. 1465, 42 U.S.C. § 1381 *et seq.*, to replace *inter alia*, the joint state-federal program known as Aid to the Permanently and Totally Disabled (APTD). The effective date of the SSI legislation was January 1, 1974. The program initially provided that persons who were permanently and totally disabled, as defined under any state plan in effect during the month of October 1972, and who were receiving aid under such plan on the basis of disability during the month of December, 1973, would automatically qualify as disabled persons who were eligible to receive SSI benefits. On December 31, 1973, however, one day before the program was to go into effect, Congress amended the statute by adding to this "grandfather" provision the additional requirement that a potential recipient must have received disability payments under a state plan for at *least one month prior to July of 1973,* Pub.L. 93–233, 87 Stat. 957. This new proviso, codified in 42 U.S.C. § 1382c (a)(3)(E), had the effect of *requiring a disability determination with respect to those persons who had received state aid during the month of December of 1973, but not for any month prior to July of 1973,* a class of persons which would automatically have been considered as eligible for disability payments under the old "grandfather" provision.

The SSI program, however, was to become effective the day following the passage of Pub.L. 93–233; hence, the Social Security Administration was unable to make eligibility determinations with respect to these so-called "rollback" individuals before payments were scheduled to begin. *Under the circumstances, the agency elected to make payments to all members of the class, pending a determination of eligibility.* These payments were purportedly made pursuant to the provisions of 42 U.S.C. § 1383(a)(4)(B), which permitted payments to "presumptively disabled" persons prior to a determination of their eligibility, without subjecting such persons to liability for recoupment of overpayments, should they ultimately be found to be ineligible. Section 1383 (a)(4)(B), however, limited such payments to a three month period which was to expire on March 31, 1974. The agency was unable to complete eligibility determinations by that time; it accordingly asked Congress to extend the period of presumptive disability until December 31, 1974. See H.R. No. 93–871, 93d Cong., 2d Sess., U.S.Code Cong. & Admin.News 1974, p. 2808. Congress agreed, and passed Pub.L. 93–256, 88 Stat. 52 (Mar. 28, 1974), which permitted presumptive disability payments during the entire calendar year of 1974, without liability for repayment if the recipients were subsequently found to be ineligible.

The administrative burden on the agency to process these "rollback" cases was so great, however, that by December of 1974, it was clear that disability determinations could not be completed by the end of that calendar year. On December 2, 1974, James B. Cardwell, Commissioner of Social Security, wrote to then Chairman Wilbur Mills of the House Committee on Ways and Means to report that the agency intended to continue to make SSI payments after December 31, 1974, to those individuals with respect to whom determination of eligibility under the federal criteria had yet to be made. The reason for this decision was that potential eligibles and ineligibles were intermingled in the remaining unprocessed caseload, and the agency would therefore be compelled either to pay all or none of these persons. Commissioner Cardwell stated that "as a matter of good administration, elemental

---

1. Counsel for defendant has informed us that the same issues have been litigated in twenty-four other District Courts.

fairness, and proper treatment of beneficiaries and claimants, [the agency] should continue payments to all of the individuals until the SSI eligibility determination is made and effectuated, even though some individuals will thereby be paid who will eventually be found to be rollbacks who do not meet SSI disability criteria." [2] With respect to the time limitation in Pub.L. 93–256, Commissioner Cardwell noted that "we view the expiration of the period specified in P.L. 93–256 as ending the time when payments can be made on the basis of presumptive disability and not be considered overpayments."[3]

Within this legislative and administrative framework, we will consider the underlying factual situation.

2. *The factual basis for the plaintiffs' claims in this action.*

The named and class plaintiffs are "rollback" individuals, who received APTD payments from the Commonwealth of Pennsylvania in December of 1973, *but not* for any month prior to July 1, 1973. During December, 1973, each received a notice from the Social Security Administration stating in substance the following: [4]

> You do not need to file an application to get supplemental security income. A gold colored check for the amount shown above * * * will come to you automatically about the first day of each month. This check will take the place of the checks you now get from your state or local public assistance office.

Plaintiffs were never asked to submit any additional information with respect to their eligibility for the SSI program; accordingly, they took no further action to ensure their eligibility, and, in fact,

their checks began arriving about the first of each month.[5]

At some point in time thereafter, the agency did decide that plaintiffs were not eligible for SSI payments, because they allegedly had failed to satisfy the criteria for disability mandated under the federal statute. Each plaintiff received a form letter [6] stating that, after a "careful review" of the evidence in the case, the Social Security Administration had determined that these recipients were ineligible, and that payments would be stopped. On the back of this form, plaintiffs were notified of their right to request a reconsideration of the agency's decision within thirty days of receipt of the notice. Such reconsideration, however, does not provide either an opportunity for personal testimony nor for cross-examination of adverse witnesses. Further, it is clear that such reconsideration, and, indeed, the entire appeal process in 20 C.F.R., Part 416, Subpart N, is available to a terminated recipient only *after* benefits have been discontinued. If the reconsideration determination is adverse to the claimant, he can request an evidentiary hearing before an administrative officer. This hearing, however, may not take place for many months; [7] during this hiatus, all benefits cease.

This action was filed in November of 1974; plaintiffs seek declaratory and injunctive relief against the termination of SSI payments prior to a full and fair hearing on the issue of eligibility. As noted above, we entered a Preliminary Injunction after hearing, based upon plaintiffs' showing that a serious and substantial question exists with respect to the constitutionality of this practice under the standards enunciated in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

---

2. Letter from James B. Cardwell, Commissioner of Social Security, to the Honorable Wilbur D. Mills, Chairman, House Committee on Ways and Means, December 2, 1974, attached to the Memorandum in Support of Defendant's Motion to Dismiss for Mootness, at p. 3.

3. *Id.* at p. 4.

4. Stipulation, ¶ 11.

5. Stipulation, ¶ 12.

6. Stipulation, Exhibits C and D.

7. Stipulation, ¶ 18.

3. *The merits of the case under the due process clause of the Fifth Amendment.*

In *Goldberg v. Kelly, supra,* the Supreme Court held that the due process clause of the Fourteenth Amendment requires that a recipient of state public assistance benefits be afforded an evidentiary hearing prior to the termination of payments:

* * * Such benefits are a matter of statutory entitlement for persons qualified to receive them. Their termination involves state action that adjudicates important rights. The constitutional challenge cannot be answered by an argument that public assistance benefits are "a 'privilege' and not a 'right.' " *Shapiro v. Thompson,* 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 1327 [22 L.Ed.2d 600, 611] (1969). Relevant constitutional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation. *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); or to denial of a tax exemption, *Speiser v. Randall,* 357. U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); or to discharge from public employment, *Slochower v. Board of Higher Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956). The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be "condemned to suffer grievous loss," *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 647, 95 L.Ed. 817 [852] (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as we said in *Cafeteria & Restaurant Workers Union etc. v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–1749, 6 L.Ed.2d 1230 [1236] (1961), "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." See also *Hannah v. Larche,* 363 U.S. 420, 440, 442, 80 S.Ct. 1502, 1513, 1514, 4 L.Ed. 2d 1307 [1320, 1321] (1960).

It is true, of course, that some governmental benefits may be administratively terminated without affording the recipient a pre-termination evidentiary hearing. But we agree with the District Court that when welfare is discontinued, only a pre-termination evidentiary hearing provides the recipient with procedural due process. *Cf. Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). For qualified recipients, welfare provides the means to obtain essential food, clothing, housing, and medical care. Cf. *Nash v. Florida Industrial Commission,* 389 U.S. 235, 239, 88 S.Ct. 362, 366, 19 L.Ed.2d 438 [442] (1967). Thus the crucial factor in this context —a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy.

*Id.,* 397 U.S. at 262–264, 90 S.Ct. at 1017 (footnotes omitted).

Not every interest, however, is protected by the due process clauses of the Fifth or the Fourteenth Amendments. In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972),

and its companion case *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L. Ed.2d 570 (1972), the Supreme Court further pinpointed those interests which are within the zone of such constitutional protection:

> * * * to determine whether due process requirements apply in the first place, we must look not to the "weight" but to the *nature* of the interest at stake. See *Morissey v. Brewer,* 408 U.S. 471, at 481, 92 S.Ct. 2593, at 2600, 33 L.Ed.2d, p. 484, at 494. We must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property.
>
> * * * * * *
>
> The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests— property interests—may take many forms.
>
> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining elgibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. *Goldberg v. Kelly* [citation omitted]. * * *
>
> * * * * * *
>
> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in *Goldberg v. Kelly, supra,* had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.

*Board of Regents v. Roth, supra,* 408 U.S. at 570–571, 576–577, 92 S.Ct. at 2705.

The concept of *Roth,* however, has proven to be extremely elusive when applied to specific factual situations.[8] In the instant case, the Secretary contends that plaintiffs do not have a protected property interest in SSI benefits until eligibility has been established; in other words, that payments received on the basis of presumptive disability are legally gratuitous, and, hence, do not invoke Fifth Amendment due process protection. In essence, the Secretary maintains that the cessation of payments to plaintiffs was not a termination, within the meaning of *Goldberg v. Kelly,* but rather an initial determination of ineligibility.

Plaintiffs argue that a protected property interest in continued receipt of SSI benefits arises from two sources: (1) receipt of SSI payments beginning January 1, 1974, accompanied by a notice from the Social Security Administration that checks would come "automatically" without further application;

---

8. *See, e. g., Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), a case dealing with discharge of a nonprobationary federal employee prior to an evidentiary hearing, in which there were five opinions, none of which could command more than three members of the Court.

(2) prior entitlement to benefits under the APTD program.[9]

■ We do not approach this issue in a vacuum. Several recent District Court decisions have analyzed the problem presented by the litigation; there is a sharp split of authority. Indeed, the complexity and subtlety of the due process question in this context is well illustrated in the extensive and well reasoned opinions of the Courts in *Hannington v. Weinberger*, 393 F.Supp. 553 (1975), in which summary judgment was entered for the Secretary, and in *Saurino v. Weinberger*, 396 F.Supp. 992 (D.R.I., 1975), in which a permanent injunction was issued in favor of plaintiffs. While the problem is by no means free from doubt, we believe that analysis and evaluation of the conflicting contentions tip the balance in favor of plaintiffs; we agree with the holding of the *Suarino* court that plaintiffs have a sufficient property interest in continued receipt of SSI benefits so as to permit them to invoke due process protection prior to the termination of those payments. See, also, *Brown v. Weinberger*, 382 F.Supp. 1092 (D.Md.1974).

In reaching this conclusion, we shall assume, *arguendo*, that receipt of benefits under the three-month presumptive disability provisions of 42 U.S.C. § 1383 (a)(4)(B) does not, in and of itself, establish a protected property interest under the *Roth* standard.[10] This assumption, however, does not end our inquiry. Plaintiffs are members of a unique class of recipients of presumptive disability payments; their benefits were initiated during the transition period from APTD to SSI, and their situation differs in many essential respects from that of routine, non-"rollback" presumptive disability recipients.

■ *First*, all of the named and class plaintiffs were recipients of benefits under the APTD program, prior to the effective date of SSI. In other words, each such individual had been medically determined to be disabled, and was in fact receiving subsistence payments under the joint state-federal welfare program which then existed to meet the needs of persons in this category. Thus, while these persons had not been determined as eligible under SSI criteria, they clearly had a protected property interest in receipt of benefits under the state-federal program which was replaced by SSI.

*Second*, the SSI program was intended by Congress as a replacement for, and in large part a continuation of, the APTD program, with the difference that it was to be placed under federal supervision, rather than under the joint control which had existed previously. While there are indications in the pertinent legislative history that Congress intended the SSI program to be a "major departure" from traditional state-federal programs, *Hannington v. Weinberger, supra*, 393 F.Supp. at 560, it seems clear that the significant changes were made with respect to the *administration* of the program, rather than with respect to its *purpose*, or to the class of *recipients* intended to be the beneficiaries. Indeed, the House Report to Pub.L. 92–603 clearly states that SSI was intended to *replace* existing welfare programs for the disabled:

\* \* \* [T]he bill would *substantially improve the effectiveness* of the adult assistance programs under the Social Security Act by providing—

(1) for *replacing* the three present State-administered programs of assistance to the aged, blind, and disabled

9. In addition to their procedural due process claims, plaintiffs also allege "equal protection" violations, based upon the theory of *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Because of our disposition of the procedural due process claims, however, it is unnecessary to reach plaintiffs' alternate ground for relief.

10. *A fortiori* we also assume, without deciding, that payment of a cash advance under 42 U.S.C. § 1383(a)(4)(A) would not establish such a protected property interest.

with one combined adult assistance program which would be Federally administered by the Social Security Administration and would have nationally uniform requirements for such eligibility factors as the level and type of resources allowed and the degree of disability or blindness;

(2) that each aged, blind, or disabled adult would receive assistance sufficient to bring his total monthly income up to [certain basic benefit levels]; and

(3) the cost of maintaining these basic benefit levels for the aged, blind, and disabled will be borne entirely by the Federal Government.

H.R. 92–231, 92d Cong.2d Sess., 3 U.S. Code Cong. & Admin.News 4989, 4992 (1972) (emphasis added).

Prior to the amendment of December 31, 1973, § 1382c(a)(3)(A) provided that persons who were receiving aid on the basis of disability under any State plan as of December of 1973 would be defined as disabled for the purposes of SSI. Thus, this provision provided, in essence, that each and every recipient under a state plan in December of that year would automatically begin to receive benefits under SSI for the following month. It is clear from this "grandfather" clause that *SSI was intended by Congress as a wholesale replacement for, and continuation of, the former state-federal programs,* in that the identity of recipients under the two plans of assistance would be absolute. It was only with respect to *future* applicants for SSI that the uniform federal criteria were to apply.

The substantial identity of APTD and SSI with respect to the *category of need* and the *class of recipients* clearly appears from the notices sent during December of 1973, prior to the December 31, 1973 amendments, by both the Commonwealth Department of Public Welfare and the Social Security Administration. The notice from the Commonwealth of Pennsylvania to APTD recipients contained the following information:[11]

Starting January 1974, a new Federal program, called Supplemental Security Income, will begin making monthly payments to aged, blind, or disabled persons who qualify. *This payment will take the place of the Public Assistance checks you are now receiving.* If you continue to be eligible for assistance during the month of December, you don't need to apply for these new payments. They will be mailed to you automatically every month for as long as you [qualify] and will be at least as much as you receive in December.

The notice from the Social Security Administration provided as follows:[12]

You do not need to file an application to get supplemental security income. A gold colored check for the amount shown above ($130.00) will come to you automatically about the first day of each month. *This check will take the place of the checks you now get from your state or local public assistance office.*

Indeed, even with respect to the *administration* of the new SSI program, the departure from the prior plan is not as radical as it may initially appear, since *the essential partnership of the states and the federal government which was the cornerstone of the APTD program was retained under SSI, albeit in a different form.* The legislative history of the SSI program illustrates the intent of Congress to provide a floor of federal payments which could be raised by additional sums to be contributed by the states at their discretion:

* * * [T]he bill would provide for Federal administration of optional State supplementation and very substantial fiscal relief to the States and localities. Each State could, at its

---

11. *Stipulation,* Exhibit "A" (emphasis in original).

12. *Stipulation,* ¶ 11 (emphasis added).

discretion, provide additional assistance to the aged, blind, and disabled and families with children over and above the basic Federal levels set in the bill. In addition, States could enter into agreements under which the Federal government would administer any such supplemental assistance without charge to the States for the costs of administration.

It is estimated that States would save about $1.5 billion in the first year of the program over what their expenditures would be under present law. The bill would assure each State that it could, if it wished, maintain its present levels of assistance to the needy aged, blind, disabled, and families with children (including increases to reflect the loss of food stamp eligibility) and still not have to spend more than the dollar amounts it expends in calender year 1971 for benefits to these same categories of people. This assurance provision would be effective only with respect to a fiscal year during which the State had an agreement with the Federal government to administer the supplemental payments.

H.R. 92–231, *supra,* 3 U.S.Code Cong. & Admin.News at 4993 (1972). The Congressional purpose to provide federal minimum payments with optional state supplementation was implemented by 42 U.S.C. § 1382e, which permitted agreements for such supplementation between the states and the Secretary of Health, Education, and Welfare, subject to certain limitations set forth in that provision. In fact, the Commonwealth of Pennsylvania did elect to supplement federal SSI payments, and notices from the Social Security Administration to SSI recipients included the following information:[13]

THE APPLICATION YOU FILED WITH THE SOCIAL SECURITY ADMINISTRATION ALLOWS YOU TO GET MONEY FROM YOUR STATE, TOO. A GOLD-COLORED U. S. GOVERNMENT CHECK WILL BE SENT TO YOU BEGINNING ON THE DATE SHOWN ABOVE. IT WILL COME TO YOU ABOUT THE FIRST DAY OF EACH MONTH AND WILL INCLUDE THE EXTRA MONEY FROM. YOUR STATE.

\* \* \* \* \* \*

YOUR CHECK IS [amount] THIS INCLUDES [amount] FROM THE STATE OF PENNSYLVANIA.

■ For all of these reasons, therefore, we conclude that the SSI program as originally enacted by Congress, prior to the December 31, 1973 amendments, was clearly intended to be a replacement for, and a continuation of, the prior state-federal APTD program; moreover, notwithstanding certain changes in the administration of the program, and the reallocation of responsibilities between the states and the federal government, the objects of the legislation, and the designation of the initial class of recipients, as a substantive matter, remained unchanged.

■ *Third,* Congress did not intend, in enacting the December 31, 1973 amendments to the SSI program, Pub.L. 93–233, to restrict the due process rights of persons in the "rollback" category, nor did any provision of these amendments deal with payment of interim benefits, pending determination of eligibility under the federal criteria.

■ As noted by the Court in *Suarino,* the December 31, 1973 amendments were intended to redress an administrative problem which arose in New York state; it was asserted that welfare officials there were transferring AFDC mothers to APTD, in order to shift the fiscal burden from the joint state-federal AFDC program to the new federal SSI program, an action that unquestionably would have resulted in higher federal and lower state costs. *Suarino, supra,* at 1001–1002. As noted in the House Report which accompanied Pub.L. 93–256, the purpose of the amendments was "to

13. *Stipulation,* Exhibit "B".

prevent the conversion to the Federal program of persons who in months immediately prior to the January 1974 changeover to SSI may have been improperly placed on the State aid to the disabled rolls." H.R. No. 93–871, *supra*, at p. 1, U.S.Code Cong. & Admin.News 1974, at 2808.

We agree with the Court in *Suarino* that

> [i]n passing the time limitation in P.L. 93–233, § 9 as an amendment to 42 U.S.C. § 1382c(a)(3)(E) Congress intended that the eligibility of persons, who did not receive AABD benefits prior to July 1, 1973, be *reviewed* in light of the definitions given in § 1382c(a)(3). Congress was in effect giving the SSA notice that they intended that those in the "presumptively disabled" group should be the first to be reviewed. This indication of priorities was not intended to terminate benefits while the review process was occurring nor was it intended that those who received AABD after July 1973 be treated the same as new applicants for SSI.

*Id.*, at 1002 (emphasis in original).

Thus, the purpose and effect of the December 31, 1973 amendments were simply to withdraw the benefits of automatic eligibility from a certain class of APTD recipients that had been enjoyed under the original version of the statute. These amendments did not prohibit the payment of interim benefits to "rollback" individuals, pending a review of their eligibility by the Social Security Administration. Indeed, when the agency chose to pay such benefits on an interim basis, Congress explicitly ratified this decision by enacting Pub.L. 93–256. Nor did the amendments deal with the issue of payment of benefits under the circumstances of this case, one in which an initial agency determination of ineligibility has been made, but prior to notice, and to the opportunity for a hearing. Finally the amendments did not alter the basic administration and the remedial purpose of the SSI program as orginally enacted.

Thus, although we have given close scrutiny to the rationale of *Hannington, supra,* we agree with the Court in *Suarino, supra,* that nothing can be found in these amendments, particularly in light of their history, to establish that Congress passed the December 31, 1973 provisions with the intention of *restricting the due process rights of* "rollback" *recipients,* or of differentiating, with respect to due process protection, between "rollbacks" and those individuals who were "grandfathered" into the program.

*Fourth,* Congress specifically recognized the unique and compelling situation of "rollback" individuals by enacting Pub.L. 93–256, which permitted payments to those persons under the presumptive disability provisions of the statute during calendar year 1974 without liability for overpayments. In the legislative history which accompanied H.R. 13025, the Committee on Ways and Means expressed concern about the "harsh and unjust effect" of a suspension of payments to "rollback" individuals, who were then receiving benefits under the 3 month presumptive disability provision, and recommended an extension of the statutory period "for these recipients only", H.R. No. 93–871, at p. 2 (emphasis added).

Congress thus ratified the decision of the agency to begin making payments under the presumptive disability sections of the statute, *Brown v. Weinberger, supra,* 382 F.Supp. at 1098. Further, Congress clearly distinguished "rollback" recipients of presumptive disability payments from initial applicants, in that "rollbacks" could be paid throughout 1974 without liability for overpayments, while initial applicants were subject to the three month limitation in the original legislation. This Congressional action is significant in assessing the "nature of the [property] interest at stake" in this controversy, *Board of Regents v. Roth, supra,* 408 U.S. at 570–

571, 92 S.Ct. at 2706, and provides persuasive support for the contention that Congress intended to confer upon "rollback" recipients a property interest which was of a different nature than that which it intended to confer on initial applicants.[14]

*Fifth,* during January and February of 1974, the named plaintiffs [15] were informed by the Social Security Administration that they were in fact *eligible* to receive SSI benefits under the law. Nothing in the notices which they received informed these individuals that they were recipients of benefits which were provisional, temporary, or contingent upon a determination of eligibility under federal standards. SSI payments in fact began arriving about the first of each month. None of the plaintiffs was asked to submit even a scintilla of additional evidence pertaining to eligibility. In complete and justifiable reliance upon the notification of eligibility sent to them by the Social Security Administration, plaintiffs took no further action to ensure their rights as recipients.

The Court in *Hannington* found these facts unpersuasive:

"The plaintiffs point to no legal duty on the part of the Secretary of Health, Education and Welfare to send any notice of plaintiffs' status. * * * There is no support for a holding which binds Congress to pay benefits because the defendant agency head failed to inform the plaintiffs of their provisional status in a congressional program."

*Id.* 393 F.Supp. at 558 (footnote omitted).

In the instant case, however, we are not asked to impose a legal duty on the Secretary to notify plaintiffs of their provisional status, nor to bind *Congress* to pay benefits because an agency failed to provide such notification. The issue in this matter is whether the *agency* must continue to make payments, pending due process hearings for "rollback" recipients, when Congress has remained silent on this score. The resolution of this question requires us to assess the property interest of plaintiffs in continued receipt of benefits. In undertaking this assessment, two highly significant factors which must be weighed are: (1) the failure by the agency to inform the plaintiffs of the provisional status of their benefits, and (2) the resultant reliance by plaintiffs on the notification of eligibility which they received.

The Opinion of the Supreme Court in *Board of Regents v. Roth, supra,* provides guidance in this matter:

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an op-

14. The last sentence of § 1 of Pub.L. 93–256 provides that "no such benefits may be paid on the basis of such presumptive disability for any month after the month in which the Secretary of Health, Education and Welfare has made a determination as to whether such individual is disabled * * *." This provision does not defeat plaintiffs' claim in the instant case. We agree with the Court in *Ryan v. Shea,* 394 F.Supp. 894 (D.Colo., 1974), that the determination of the Secretary must "be made consistently with due process

under *Goldberg v. Kelly,*" Such an interpretation of the statute will avoid any question as to its constitutionality. See *N. L. R. B. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

15. Plaintiffs Buckles, Alicea, and Smeraski were notified of their eligibility. *Stipulation* ¶¶ 23, 36, 49. Presumably, other class members received identical notices. See *Stipulation,* Exhibit "B".

portunity for a person to vindicate those claims.

*Id.*, 408 U.S. at 577, 92 S.Ct at 2709.

In the instant case, it is clear that plaintiffs were, in fact, initially told by the agency that they were *eligible* for SSI payments, and thus, had "more than unilateral expectation" of continued receipt of such benefits. Further, plaintiffs relied—to their detriment—on the notice of eligibility which they received. Such reliance "must not be arbitrarily undermined." *Id.*, 408 U.S. at 577, 92 S.Ct. 2701.

In conclusion, therefore, for the reasons discussed *supra*, we hold that plaintiffs have established a sufficient property interest in continued receipt of their SSI benefits to invoke the due process protection of *Goldberg v. Kelly*, *supra* prior to determination.

4. *The statutory authority to make payments after December 31, 1974.*

Public Law 93–256, which extended the period of presumptive disability without liability for overpayments, provides as follows, in pertinent part:

* * * any individual who would be considered disabled under section 1614(a)(3)(E) of the Social Security Act [42 U.S.C. § 1382c(a)(3)(E)] except that he did not receive aid under the appropriate State plan for at least one month prior to July 1973 may be considered to be presumptively disabled under section 1631(a)(4)(B) of that Act [42 U.S.C. § 1383(a)(4)(B)] and may be paid supplemental security income benefits under title XVI of that Act on the basis of such presumptive disability, and State supplementary payments under section 212 of Public Law 93–66 as though he had been determined to be disabled within the meaning of section 1614(a)(3) of the Social Security Act [42 U.S.C. § 1382c(a)(3)] for *any month in calendar year 1974* for which it has been determined that he is otherwise eligible for such benefits, without regard to the three-month limita-

tion in section 1631(a)(4)(B) of that Act [42 U.S.C. § 1383(a)(4)(B)] on the period for which benefits may be paid to presumptively disabled individuals, except that no such benefits may be paid on the basis of such presumptive disability for any month after the month in which the Secretary of Health, Education, and Welfare has made a determination as to whether such individual is disabled, as defined in section 1614(a)(3)(A) of that Act [42 U.S.C. § 1382c(a)(3)(A)].

(emphasis added).

The Secretary argues that P.L. 93–256 contains an express limitation on his authority to make payments under the presumptive disability provisions of the statute, and that such payments must cease after December 31, 1974.

Perhaps the most cogent counterargument is that offered by Commissioner Cardwell himself in his December 2, 1974, letter to then Chairman Mills, in which he discussed the agency's decision to continue making payments to "rollback" individuals after the December 31, 1974 cutoff in P.L. 93–256.

We plan to continue SSI payments to each case until we have made a determination whether or not the individual is eligible for SSI and we can effectuate the decision. We have little choice in this matter since the potential eligibles and ineligibles are intermingled in the remaining workload. Our options essentially are to continue payments for all remaining cases or to discontinue payments for all of these cases. To discontinue, we would have to send a notice around December 1 to all of the remaining 49,000 or so cases, including individuals already determined to meet the SSI disability criteria but not yet absorbed by the SSI data system, as well as individuals who before December 31 will be found not to be rollback cases at all. Moreover, as the remaining workload is processed through December, reversal of the

proposed discontinuation actions on a case-by-case basis would cause serious dislocations in our operations and would result in possible delays and risks of error in payments to the individuals affected. Therefore, we believe that, as a matter of good administration, elemental fairness, and proper treatment of beneficiaries and claimants, we should continue payments to all of the individuals until the SSI eligibility determination is made and effectuated, even though some individuals will thereby be paid who will eventually be found to be rollbacks who do not meet SSI disability criteria.

We believe this action to be consistent with the Congressional intent in enacting P.L. 93–256. In providing for payments on the basis of presumptive disability throughout calendar year 1974, the Congress appears to have been serving three purposes: (1) Continuation of payments to individuals affected by section 9 of P. L. 93–233 until their SSI eligibility status can be definitively determined; (2) Protection of the individuals against being charged with overpayments for this period; and (3) Protection of the States from the administrative burden and cost of providing aid to needy individuals pending the SSI determination, particularly where the majority of the individuals will eventually be found to be eligible for SSI. Our planned continuation of payments until the SSI determinations are made will continue to serve the first and third purposes. As to the second purpose, we view the expiration of the period specified in P. L. 93–256 as ending the time when payments can be made on the basis of presumptive disability and not to be considered overpayments. Accordingly, any payments for months after December 1974 to rollback individuals who are eventually found not to have been eligible for SSI will be considered as overpayments, sub-

ject to adjustment or recovery in accordance with the provisions of section 1631(b) of the Social Security Act.

■ We agree with Commissioner Cardwell that Pub.L. 93–256 was not intended by Congress as a denial of fiscal authority to make SSI payments after December 31, 1974.

*First,* we note that the agency initially decided to make payments on the basis of presumptive disability before P.L. 93–256 was enacted, for the reason that a determination of eligibility could not be made for "rollback" individuals between December 31, 1973, the date of enactment of P.L. 93–233, and January 1, 1974, the effective date of the SSI program; hence, the agency quite properly decided to pay all "rollback" individuals rather than none. Congress explicitly approved this practice in P.L. 93–256, based upon assurances from the Secretary that a substantial majority of the persons in the "rollback" categories would ultimately be found eligible for SSI benefits. See H.R. No. 93–871, 93d Cong., 2d Sess., at p. 2.

*Second,* the legislative history of Pub. L. 93–256 establishes that Congress chose the December 31, 1974 limitation, *because the Secretary represented that analysis of the "rollback" caseload would be completed by that date, and not because Congress wished thereafter to suspend payments to unprocessed individuals:*

The Department of Health, Education, and Welfare has indicated that enactment of the provision in P.L. 93–233 has created a workload *that cannot be completed until the end of 1974.* The first step in implementing the provision is the screening of the 1.3 million disability cases converted from State records to determine which individuals came on State disability rolls after June 1973. This process—now partly completed—ultimately requires manual searches of some of the State and County files. By far the largest and most time-consuming administrative task is that

of making disability determinations under the Federal criteria for individuals found not to have received State disability assistance before July 1973. These determinations need to be made by State disability determination units * * *.

H.R. 93–871, *supra,* at p. 2, U.S.Code Cong. & Admin.News 1974, at p. 2809 (emphasis added).

*Third,* we agree with Commissioner Cardwell that the intent of Congress in enacting Pub.L. 93–256 was threefold: (1) to ensure continuation of SSI payments to unprocessed individuals, a substantial majority of whom would ultimately be found eligible under federal criteria; (2) to avoid the administrative and fiscal burden on state assistance programs should SSI payments to "rollback" individuals be suspended; and (3) to protect SSI recipients from liability for overpayments, should they later be found ineligible for benefits. Implementation of the first two of these stated goals clearly would be served by continuation of payments after December 31, 1974. With respect to the third factor, the agency has concluded that payments after December 31, 1974, will be considered as overpayments, subject to adjustment or recovery under the provisions of 42 U.S.C. § 1383(b). The issue of recoupment of overpayments, however, is not before us at this time, and we decline to decide a hypothetical issue which may never arise.[16]

Finally, we note that other courts have reached a similar conclusion with respect to the effect of P.L. 93–256. At a hearing in *Brown v. Weinberger,* No. H–74–479 (D.Md., January 2, 1975), Judge Harvey stated:

Although Congress did indicate in Public Law 93–256 that payments would be made to those presumptively disabled "for any month in calendar year 1974," this language when viewed in the light of the legislative history and the other facts mentioned here would appear directory rather than mandatory. The language was included with the understanding that the necessary reviews of eligibility would be completed by December 31, 1974, and Congress thus used this same date in permitting payments to those presumptively disabled. In other words, the deadline was not imposed as a date for removing eligible persons from the rolls. Rather it was the date when defendant had indicated its review ·job would be completed.

*Id.,* N.T. 4–5 (January 2, 1975).

See also Judge Matsch's ruling from the bench in *Ryan v. Shea,* 394 F.Supp. 894 (D.Colo., 1974).

We conclude, therefore, that the provisions of Pub.L. 93–256 do not impose a barrier to the issuance of a permanent injunction under the circumstances of the instant case.

5. *The form and effect of the permanent injunction and the scope of the class.*

The last issue goes to the form and effect of the final injunction to be entered and the parameters of the class.

In the preliminary injunction issued on December 20, 1974, the Secretary was ordered to pay SSI benefits to the named and class plaintiffs, pending further Order of the Court. In the permanent injunction, however, it

---

16. We note that 42 U.S.C. § 1383(b) requires the Secretary to "make such provision as he finds appropriate in the case of payment of more than the correct amount of benefits with respect to an individual *with a view to avoiding penalizing such individual or his eligible spouse who was without fault in connection with the overpayment, if ad-* *justment or recovery on account of such overpayment in such case would defeat the purposes of this subchapter, or be against equity or good conscience,* or (because of the small amount involved) impede efficient or effective administration. of this subchapter." (emphasis added).

is necessary to specify the type of hearing which must precede termination of SSI payments to "rollback" individuals. While it would be possible for this Court to formulate guidelines of procedural fairness which would satisfy the mandate of *Goldberg v. Kelly, supra,* we are concerned that if each of the District Courts dealing with litigation of this character were to establish its own standards, the agency might possibly confront an unnecessarily harsh administrative burden in bringing procedures of local Social Security offices into conformity with the different criteria which might be set by the courts in the multitude of districts that have litigation of this type before them. We prefer, therefore, the approach of the Court in *Brown v. Weinberger, supra,* 382 F.Supp. at 1099, which adopted the Secretary's own regulations found in 20 C.F.R., Part 416.

* * * The defendant's own regulations, as set forth in 20 C.F.R. § 416.1417(b) and (c) would appear to meet the *Goldberg* standards and should be applied to plaintiffs and the members of their class before their benefits may be terminated. Generally, these regulations allow the calling of witnesses, a review of the record, the subpoenaing and cross-examination of adverse witnesses and representation by counsel. Although the thirty days written notice requirement would appear appropriate, this Court would suggest that the notice should contain a brief statement of the reasons for the initial determination of ineligibility so that the individual involved may be better able to determine whether to seek reconsideration and to prepare for a subsequent hearing.

We agree with Judge Harvey, and, further, we shall *require* such a brief statement of reasons for the determination of ineligibility in the initial notice. See also *Suarino v. Weinberger, supra,* at 1003. With the addition of this requirment, our final injunction will incorpo-rate the procedural safeguards of 20 C.F.R., Part 416, subpart N, which must be satisfied by the Secretary *before* SSI benefits may be terminated as to plaintiffs and as to the members of the class which they represent.

■ With respect to the final class determination, we shall adopt that incorporated in the preliminary injunction. We are not persuaded by the Secretary's argument that persons who have previously been terminated *illegally,* should be foreclosed from the restoration of those benefits merely because they have *in the past* failed to request a reconsideration of the agency's decision under 20 C.F.R., Part 416, subpart N. It is possible that many of the recipients regarded the termination as a *fait accompli,* irrespective of the contents of the notice on the reverse of the form letter which they received; a request for reconsideration would not have led to a restoration of benefits pending the appeals process, in any event.

*Once benefits have been restored* under the provisions of the preliminary injunction, however, the agency may proceed in accordance with appropriate procedures which satisfy the due process clause to remove those persons from the program who are found to be ineligible under federal standards. Should such persons, after receipt of proper notice including a brief statement of reasons for the determination of ineligibility, request reconsideration under the regulations, benefits would of course continue to be paid during the pendency of these proceedings. Should such persons fail to request reconsideration, benefits may be terminated after the applicable deadline for such request expires.

Pursuant to Rules 65 and 52 of the Federal Rules of Civil Procedure, we make the following Findings of Fact and Concusions of Law:

## FINDINGS OF FACT

1. In Pennsylvania, prior to January 1, 1974, named and class plaintiffs

were beneficiaries of Pennsylvania's APTD program.

2. Named and class plaintiffs received APTD in December of 1973, but not for any month prior to July 1, 1973.

3. Approximately 10,500 people were transferred into SSI from the rolls of Pennsylvania's APTD program who had received APTD in December, 1973, although not for any month prior to July, 1973.

4. Because named plaintiffs and those similarly situated had been determined by Pennsylvania officials to be disabled, they received letters from the Social Security Administration, on or about December, 1973, stating in part:

> "You do not need to file an application to get supplemental security income. A gold colored check for the amount shown above ($130.00) will come to you automatically about the first day of each month. This check will take the place of the checks you now get from your state or local public assistance office."

5. Plaintiffs were never requested by defendant to submit any additional evidence to substantiate their claim. Plaintiffs' checks began to arrive on the first of each month. Plaintiffs took no further action to ensure their eligibility.

6. Plaintiffs' eligibility for SSI benefits has been evaluated under federal standards by the Social Security Administration, and they have been found ineligible because, allegedly they are not disabled.

7. Named plaintiffs represent a class, under Rule 23(b)(2) of the Federal Rules of Civil Procedure, of over 4,500 persons in Pennsylvania who were found ineligible for SSI payments without being afforded an opportunity for a hearing prior to that determination by the agency.

8. The appeal process provided by defendant is found at 42 U.S.C. § 1383 (c)(1), (3), and 20 C.F.R., Part 416.

The appeal stages are carried out *after* benefits are discontinued, based upon defendant's contention that the cessation of payments is an initial determination rather than a suspension.

9. Named plaintiffs are following the steps in the appeal process, the first of which is known as "reconsideration". Reconsideration does not provide an opportunity to testify in person, nor to cross-examine adverse witnesses. The named plaintiffs have all requested reconsideration.

10. The second step in the appeal process provided by defendant is a hearing before a hearing officer. This hearing is the first opportunity plaintiffs will have to contest their finding of ineligibility through oral testimony.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties in this litigation.

2. Jurisdiction over the subject matter of this cause arises from the provisions of the Mandamus and Venue Act of 1962, Pub.L. 87–748, § 1(a), 76 Stat. 744, 28 U.S.C. § 1361. *Mattern v. Weinberger*, 519 F.2d 150 (3d Cir., 1975); *Brown v. Weinberger*, 382 F. Supp. 1092, 1097 (D.Md.1974); *Padilla v. Weinberger*, No. 74–439 Civil (D.N. M., Sept. 20, 1974); *Ryan v. Shea*, 394 F.Supp. 894 (D.Colo., 1974); *Lyons v. Weinberger*, 376 F.Supp. 248, 255 (S. D.N.Y., 1974).

3. Venue lies in the Eastern District of Pennsylvania, 28 U.S.C. § 1391 (e).

4. This case may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, for the following reasons:

(a) the class, consisting of approximately 4500 person in Pennsylvania, is so numerous that joinder of all members is impracticable;

(b) there are questions of law or fact common to all members of the class;

(c) the claims of the named plaintiffs are typical of the claims of the class;

(d) the named plaintiffs, represented by competent and experienced counsel, will fairly and adequately protect the interests of the class;

(e) defendant Weinberger and his agents and delegates have acted or refused to act on grounds generally applicable to the class, thereby making it appropriate to enter injunctive relief with respect to the class as a whole.

5. Termination of SSI benefits to the named and class plaintiffs must conform to the requirements of due process of law as mandated by the decision of the Supreme Court in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

6. Under the circumstances of this case, due process requires that SSI recipients be afforded advance notice and, if requested, an evidentiary hearing, *prior* to the termination of benefit payments. *Suarino v. Weinberger,* Civ. Action No. 74–140 (D.R.I., filed June 3, 1975); *Brown v. Weinberger,* 382 F.Supp. 1092 (D.Md.1974); *Padilla v. Weinberger,* No. 74–439 Civil (D.N.M., September 20, 1974); *Atwater v. Weinberger,* No. C–74–243–D (M.D.N.C., Sept. 17, 1974); *Ryan v. Shea,* 394 F.Supp. 894 (D.Colo.1974).

7. The provisions of Pub.L. 93–256, 88 Stat. 52, (March 28, 1974) do not prohibit payment of SSI benefits to the named and class plaintiffs after December 31, 1974.

8. A final and permanent injunction should issue prohibiting termination of SSI benefits to the named and class plaintiffs: (1) without advance notice, and, (2) if requested, without an evidentiary hearing, *prior* to such termination; the injunction shall further provide that such notice and hearing shall be in substantial compliance with the provisions of 20 C.F.R., Part 416, Sub-

part N, and, further, that such advance notice shall contain a brief statement of the reasons for the Secretary's determination of ineligibility.