539 F.2d 1111
 Gilbert JOHNSON, Individually and on Behalf of all others
similarly situated, Appellee-Appellant,
v.
F. David MATHEWS, Secretary of the Department of Health,
Education & Welfare, Appellant-Appellee.
 Nos. 75-1297, 75-1345.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 10, 1975.
Decided June 15, 1976.
 
 Harry R. Silver, Appellate Section, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for F. David Mathews of HEW; Rex E. Lee, Asst. Atty. Gen., Jefferson City, Mo., Donald J. Stohr, U. S. Atty. (Barry Short, U. S. Atty. effective May 15, 1976), St. Louis, Mo., William Kanter and John M. Rogers, Attys. Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., on brief.
 Walter Heiser, Legal Aid Society of City of St. Louis, St. Louis, Mo., for Gilbert Johnson.
 Before HEANEY, WEBSTER and HENLEY, Circuit Judges.
 WEBSTER, Circuit Judge.
 
 
 1
 This is a class action brought on behalf of individuals in Missouri who began receiving Aid to the Permanently and Totally Disabled (PTD) benefits from the State of Missouri after July 1, 1973, but before December 31, 1973, and were thereafter initially determined to be ineligible for benefits under the federal Supplemental Security Income for Aged, Blind and Disabled (SSI) program, which supplanted the Missouri PTD program in January, 1974. The District Court entered both preliminary and permanent injunctive relief enjoining the Secretary of Health, Education, and Welfare from withholding benefits from the individual plaintiff and the members of the class until they were given notice of and an opportunity for an evidentiary hearing prior to any termination of such benefits. The District Court, however, refused to order the defendant to make retroactive payments of benefits to the individual plaintiff or members of the class. Both plaintiff and defendant appeal. For the reasons stated below, we affirm the judgment of the District Court.[1]
 
 
 2
 A review of the history of the state PTD and federal SSI programs is necessary for a proper evaluation of the various claims in this case.
 
 
 3
 In October, 1972, Congress repealed the categorical assistance program of federal grants to state administered disability assistance programs for the aged, blind, and disabled (Title XIV of the Social Security Act). Pub.L.No.92-603, § 303 (Oct. 30, 1972). In its place, Congress established, in Title XVI of the Social Security Act, a new income maintenance program, effective as of January 1, 1974, which replaced the state administered programs with the federal SSI program establishing uniform eligibility criteria. Pub.L.No. 92-603, § 301. Under the SSI program, the federal government was to administer the program and was to assume the burden of providing benefits to those persons who were disabled as defined by the Act.
 
 
 4
 As originally enacted, the SSI program provided that a person found permanently and totally disabled under an approved state plan in effect in October, 1972, would automatically be considered disabled for purposes of the SSI program if he received state aid during December, 1973, and remained continuously disabled. Pub.L.No.92-603, § 301. On December 31, 1973, one day before the SSI program was to become effective, Congress amended Pub.L.No. 92-603 to require that in addition to receiving benefits during December, 1973, an individual must have received benefits for one month prior to July, 1973, in order to qualify under the "grandfather" clause. Pub.L.No.93-233, § 9 (Dec. 31, 1973); see 42 U.S.C. § 1382c(a)(3)(E). The purpose of this amendment was "to prevent the conversion to the Federal program of persons who in months immediately prior to the January 1974 changeover to SSI may have been improperly placed on the State aid to the disabled rolls." H.R.Rep.No.93-871, 2 U.S.Code Cong. & Admin.News, p. 2808 (1974). See also H.R.Rep.No.93-627, 2 U.S.Code Cong. & Admin.News, pp. 3177, 3183 (1973). Thus, as of January 1, 1974, the federal government had for all practical purposes taken over the payments of benefits to the disabled needy. Those individuals who were receiving Missouri PTD benefits as of December 31, 1973, and who had also received such benefits for at least one month prior to July, 1973, were conclusively presumed to meet the federal standards of disability and began receiving SSI benefits.
 
 
 5
 The plaintiff and members of the class in this case are individuals who were receiving state PTD benefits in December, 1973, but who had commenced receiving those benefits after July 1, 1973, and were thus not automatically qualified under the federal program. These persons had to meet the federal standard of disability in order to receive benefits under the SSI program.
 
 
 6
 The last minute amendment to the "grandfather" clause presented the Secretary with the problem of dealing with those individuals who had commenced receiving benefits under a state plan between July and December, 1973, but were facing termination of benefits. Although no statutory provisions existed as of January 1, 1974, to pay benefits to these "rollback" cases as such, the Secretary used a statutory provision, ostensibly aimed at initial applicants who were found to be presumptively disabled, to continue payments to persons who had not yet been initially determined to be qualified. See 42 U.S.C. § 1383(a)(4)(B), which provides that before an initial determination of eligibility the Secretary may pay benefits for a period of up to three months to those whom he judges to be presumptively disabled. By regulation, the Secretary classified rollback cases as presumptively disabled. See 20 C.F.R. § 416.954. Under this system, the rollback recipient would receive presumptive SSI benefits until an initial determination of eligibility. If the initial determination was adverse to the party's claim for SSI benefits, presumptive disability benefits ceased immediately. The unsuccessful claimant then had the right to have this determination reconsidered in a proceeding where notice and hearing rights were provided. However, no benefits were provided after an adverse initial determination. The initial determination was made upon the basis of a paper review of the records maintained under Missouri's disability assistance program and without notice or an opportunity to be heard.
 
 
 7
 At the urging of the Secretary, Congress passed, in March, 1974, legislation extending the period during which the Secretary might pay presumptive SSI disability benefits to rollback recipients from three months to the period ending on December 31, 1974. Pub.L.No.93-256 (March 28, 1974). Congress also provided "that no such benefits may be paid on the basis of such presumptive disability for any month after the month in which the Secretary of Health, Education, and Welfare has made a determination as to whether such individual is disabled * * *." Id.
 
 
 8
 Plaintiff represents a class of persons who have received adverse initial determinations but who have not yet had their cases reconsidered, and thus they would not have received SSI benefits beyond the initial determination date except for the District Court's injunctive order. The District Court's injunction was based upon its holding that the individual plaintiff and the members of the class he represents were entitled to notice and a hearing before the benefits they were receiving on the basis of presumptive disability could be terminated.
 
 
 9
 The District Court first issued a temporary restraining order preventing discontinuance of payments to the plaintiff and the class members until they were given a pre-termination hearing. The District Court initially refused to accept the government's contention that retroactive SSI benefits were barred by the sovereign immunity doctrine, but later did issue a stay of any retroactive relief pending disposition on the merits. The District Court then issued a permanent injunction incorporating its prior orders. Apparently, the District Court held that the payment of retroactive SSI benefits was barred by sovereign immunity since it incorporated the stay into its final order. The government appeals from the District Court's decree granting injunctive relief;[2] the plaintiff appeals from the denial of retroactive payment of SSI benefits.
 
 I. JURISDICTION
 
 10
 The government originally contended on appeal that the District Court lacked federal subject matter jurisdiction, relying upon Weinberger v. Salfi,422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). It now concedes that jurisdiction may be found under 42 U.S.C. § 405(g)[3] in light of the recent Supreme Court opinion in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); we agree.[4] In Eldridge, the Court explained the application of the test announced in Salfi :
 
 
 11
 Salfi identified several conditions which must be satisfied in order to obtain judicial review under § 405(g). Of these, the requirement that there be a final decision by the Secretary after a hearing was regarded as "central to the requisite grant of subject matter jurisdiction . . . ." Id., 422 U.S. at 764, 95 S.Ct. at 2466. Implicit in Salfi however, is the principle that this condition consists of two elements, only one of which is purely "jurisdictional" in the sense that it cannot be "waived" by the Secretary in a particular case. The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary. Absent such a claim there can be no "decision" of any type. And some decision by the Secretary is clearly required by the statute. (footnote omitted)
 
 96 S.Ct. at 899.[5]
 
 12
 As in Eldridge, the special circumstances of this case warrant our holding that the test of Salfi has been met. First, the plaintiff and the members of the class have effectively presented a claim to continued presumptive disability benefits to the Secretary. When the administration of the program shifted from state to federal authorities, the files of the plaintiff and the class members were transferred to the federal authorities and no more information was solicited from the claimants. The plaintiff was notified by letter that his case was under review and that he would not be required to provide any additional information or do anything further unless notified. The Secretary clearly had the plaintiff's claim for continued benefits before him, and no more could have been done by the plaintiff to present the claim. Likewise, the claims of all the members of the class were before the Secretary. We thus conclude that the first element of this Salfi condition was met. Second, this case presents exactly the same claim for a pre-termination hearing as was presented in Eldridge, where the Court held that denial of the request for benefits constituted a final decision for the purposes of Section 405(g) jurisdiction over the collateral constitutional claim to a pre-termination hearing.
 
 
 13
 We conclude therefore that the District Court had jurisdiction under Section 405(g) as made applicable to the SSI program by 42 U.S.C. § 1383(c)(3).
 
 II. PROCEDURAL DUE PROCESS
 
 14
 Whether or not the plaintiff and the members of the class are entitled to an evidentiary hearing prior to the termination of the presumptive disability payments under the SSI program involves a two-step analysis. The first determination is whether the plaintiff had a "property" interest in the continued payment of the benefits so that the dictates of procedural due process apply.[6] See Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Once it is decided that procedural due process is applicable, the second step is the determination of what process is due. See Greenhill v. Bailey, 519 F.2d 5, 9 (8th Cir. 1975).
 
 A. Property Interest
 
 15
 The Secretary contends (1) that the plaintiff had no protected property interest in the continued receipt of the SSI presumptive disability benefits since the legislation creating that program evidences no intent to confer such an interest on the plaintiff and the members of the class which he represents; and (2) that, even if the plaintiff had a property interest in the continued receipt of benefits, any such interest terminated on December 31, 1974, since under Pub.L.No.93-256 the Secretary's statutory authority to pay presumptive disability benefits terminated on that day.
 
 
 16
 The plaintiff contends (1) that a protected property interest is to be found in the continuing nature of the SSI program as it replaced the state PTD program, in the policies and practices of the Secretary with respect to the notices and letters he sent to the plaintiff, and in the statutory creation of the Secretary's authority to pay presumptive benefits; and (2) that the property interest did not terminate on December 31, 1974.
 
 
 17
 The Supreme Court established the principles and guidelines to be applied in determining whether a claimed interest constitutes a protected property interest in Board of Regents v. Roth, supra, and Perry v. Sindermann, supra. In Roth, the Court said:
 
 
 18
 The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests property interests may take many forms.
 
 
 19
 Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 (90 S.Ct. 1011, 25 L.Ed.2d 287). * * *
 
 
 20
 * * * To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
 
 
 21
 Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.
 
 
 22
 408 U.S. at 576-77, 92 S.Ct. at 2708. In Sindermann, the Court held that because the respondent had "alleged the existence of rules and understandings, promulgated and fostered by state officials" that may have justified his legitimate claim of entitlement to continued employment, the respondent should be given the "opportunity to prove the legitimacy of his claim of such entitlement in light of 'the policies and practices of the institution.' " 408 U.S. at 602-03, 92 S.Ct. at 2700.
 
 
 23
 Examining the possible sources of a protected property interest in the circumstances of this case, we agree with the majority of courts which have addressed this issue[7] and conclude that the plaintiff and the members of the class had a protected property interest.
 
 1. Prior Receipt of State PTD Benefits
 
 24
 First, the plaintiff and all of the members of the class were by definition recipients of disability benefits under the state PTD program. They had a protected property interest in the continued receipt of those benefits which could not be terminated without the protections of due process. See Mathews v. Eldridge, supra, 96 S.Ct. at 901. See also Buckles v. Weinberger, 398 F.Supp. 931, 938 (E.D.Pa.1975); Saurino v. Weinberger,396 F.Supp. 992, 998-99 (D.R.I.1975). The SSI program is basically a continuation and extension of the prior federal-state programs.[8] Buckles v. Weinberger, supra, 398 F.Supp. at 938-40; Saurino v. Weinberger, supra, 396 F.Supp. at 1000-02. The program was a part of the "basic restructuring of the national welfare system". H.R.Rep.No.92-231, 3 U.S.Code Cong. & Admin.News, p. 4989 (1972). Comparison of the state PTD program with the SSI program supports this conclusion. The intended beneficiaries are the same under both programs and the disability eligibility requirements are similar. Compare 42 U.S.C. § 1382c(a)(3) with Missouri Division of Welfare Regulation 95 (1967). In addition, Congress's inclusion of the "grandfather" clause indicates that the SSI program was designed to replace the state PTD program. See Ryan v. Shea, 525 F.2d 268, 270 (10th Cir. 1975). Finally, in a notice to the plaintiff concerning the institution of the SSI program the Secretary indicated to the plaintiff that the SSI program was designed to replace the state program.[9]
 
 
 25
 The continuing nature of the SSI program provides a basis for concluding that a protected property interest exists. The plaintiff had a protected property interest in the receipt of state PTD benefits, and the protections of due process may not be obviated by the transfer of the over-all administration of the program to the federal government. Saurino v. Weinberger, supra, 396 F.Supp. at 1002; Brown v. Weinberger, 382 F.Supp. 1092, 1097 (D.Md.1974), aff'd mem., 529 F.2d 514 (4th Cir. 1975). See also Lyons v. Weinberger, 376 F.Supp. 248, 260 (S.D.N.Y.1974).
 
 2. Policies and Practices of the Secretary
 
 26
 During the changeover of programs, there was no interruption in the payment of benefits to the plaintiff and there was no indication in the initial notices that the benefits were provisional in nature. Instead, the plaintiff was sent a notice which informed him (1) that he was eligible for SSI benefits; (2) that he need not file an application to receive these benefits; and (3) that he would automatically receive the benefits on a monthly basis.[10] He received additional notices informing him of increases in the amount of the benefits. Finally, while he received a notice informing him that his case was being reviewed to determine if he was eligible under federal law, he was told that he was not required to provide any further information unless requested to do so.
 
 
 27
 These actions of the Secretary are sufficient to support the plaintiff's legitimate claim of entitlement to, and thus a property interest in, the continued receipt of benefits. Buckles v. Weinberger, supra, 398 F.Supp. at 942-43. "In complete and justifiable reliance upon the notification of eligibility" sent to him by the Secretary, the plaintiff took no further action to ensure his rights as a recipient. Id. at 942. The plaintiff thus had more than a "unilateral expectation" of continued benefits and his reliance on that expectation "must not be arbitrarily undermined." Board of Regents v. Roth, supra, 408 U.S. at 577, 92 S.Ct. 2701.
 
 
 28
 3. Effect of Public Law Nos. 93-233 and 93-256
 
 
 29
 Pub.L.No.93-256 "ratified" the Secretary's practice of paying presumptive disability benefits to the rollback cases. This action evidenced an intent to provide rollbacks with SSI benefits, albeit on a provisional basis. The action of Congress in Pub.L.No.93-233 in amending the "grandfather" clause to require receipt of at least one month's benefits under the state program prior to July, 1973, was not intended by Congress to restrict the due process rights of persons in the rollback category.[11] The purpose of the amendment was to prevent the improper transfer of ineligible recipients to the disability rolls. H.R.Rep.No.93-871, 2 U.S.Code Cong. & Admin.News, p. 2808 (1974).
 
 
 30
 Under Pub.L.No.93-256, the Secretary's express statutory authority to make presumptive disability benefit payments ended on December 31, 1974. Congress imposed the December 31st expiration date in response to the Secretary's assurances that all eligibility decisions on rollbacks could be completed by that time. See H.R.Rep.No.93-871, 2 U.S.Code Cong. & Admin.News, p. 2809 (1974). Congress obviously expected the task to be finished by that date. The Secretary has in fact continued to pay presumptive disability benefits to those individuals whose cases have not yet been reviewed. This action is based upon the view that the continuation of the payments is consistent with the legislative intent behind Pub.L.No.93-256.[12] We therefore conclude that the plaintiff's protected property interest did not terminate on December 31, 1974, by reason of Pub.L.No.93-256.[13]
 
 B. Requirements of Due Process
 
 31
 In determining what procedures are necessary to satisfy the requirements of due process, we are aided by a recent statement of the Supreme Court that:
 
 
 32
 (I)dentification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 33
 Mathews v. Eldridge, supra, 96 S.Ct. at 903. We conclude from our analysis of these factors that in the particular circumstances of this case due process requires that a rollback recipient be afforded notice and an evidentiary hearing prior to termination of presumptive SSI benefits.
 
 
 34
 In Mathews v. Eldridge, supra, the Supreme Court held that due process does not require that a pre-termination evidentiary hearing be afforded to recipients of disability benefits under Title II of the Social Security Act, 42 U.S.C. § 423. The Court reached this conclusion despite its holding in Goldberg v. Kelly, supra, which established the right to an evidentiary hearing prior to termination of welfare assistance. The Court distinguished the two cases primarily by noting that Goldberg involved benefits which were based upon the crucial factor of financial need. The Court stated that "(e)ligibility for disability benefits (under Title II) is not based upon financial need" and that eligibility "is wholly unrelated to the worker's income or support from many other sources". Mathews v. Eldridge, supra, 96 S.Ct. at 905. While the Court conceded that in view of the torpidity of the administrative review process and "the typically modest resources of the family unit of the physically disabled worker, the hardship imposed upon the erroneously terminated disability recipient may be significant," it qualified the hardship in this way:
 
 
 35
 Still, the disabled worker's need is likely to be less than that of a welfare recipient. In addition to the possibility of access to private resources, other forms of government assistance will become available where the termination of disability benefits places a worker or his family below the subsistence level.
 
 
 36
 Id. at 906. (footnotes omitted). One such form of government assistance cited by the Court was the benefits receivable under the SSI program. The Court also considered significant the fact that a recipient whose benefits are terminated is awarded full retroactive relief if he ultimately prevails. The Court then concluded that, with respect to the private interest that would be affected, there was "less reason * * * than in Goldberg to depart from the ordinary principle * * * that something less than an evidentiary hearing is sufficient prior to adverse administrative action." Id. at 907.
 
 
 37
 In evaluating the probable value of additional procedural safeguards, the Court held that the nature of the inquiry on disability under Title II did not warrant the conclusion that a pre-termination hearing was required. Because the medical assessment of a worker's condition involves a more sharply focused and easily documented decision than the typical welfare determination and because the decision will usually turn on routine, standard, and unbiased medical reports, the potential value of an evidentiary hearing was substantially less than in Goldberg. Mathews v. Eldridge, supra, 96 S.Ct. at 907. The Court also indicated that the submission of written documents provided the recipient, in the disability context, with an adequate and effective means of communicating has case to the decisionmaker,[14] whereas such documents were not normally adequate in the welfare context. Id. at 907-08.
 
 
 38
 Finally, the Court held that imposing a requirement of a pre-termination evidentiary hearing would impose fiscal and administrative burdens out of proportion to any countervailing benefits. These burdens would arise out of "the incremental cost resulting from the increased number of hearings and the expense of providing benefits to ineligible recipients pending decision." Mathews v. Eldridge, supra, 96 S.Ct. at 909.
 
 
 39
 The Court then concluded that the analysis of the relevant factors indicated that a pre-termination evidentiary hearing was not required and that the administrative procedures currently in use for termination decisions on Title II disability benefits fully comported with due process.
 
 
 40
 In this case, we deal not with Title II disability benefits but rather with Title XVI disability benefits under the SSI program. We find, after an analysis of the relevant factors, that the particular circumstances surrounding such benefits do require adequate notice and a pre-termination evidentiary hearing.
 
 
 41
 With respect to the plaintiff's interest in the continued receipt of these presumptive disability payments, we observe, as the Supreme Court noted in Eldridge, that SSI benefits are based in part upon financial need. See 42 U.S.C. §§ 1382(a)(1) and (2). In fact, the Supreme Court expressly relied upon this source of income as one of the "other" sources in Eldridge.[15] We thus conclude that the plaintiff's interest in the continued receipt of benefits is greater than it was in Eldridge and approaches, if not equals, the interest found in Goldberg.
 
 
 42
 Next, while the disability determination in this case is the same as that in Eldridge, the case is factually distinguishable. The plaintiff was not afforded the opportunity to submit additional information to the decisionmaker prior to termination nor was he informed of the reasons for or evidence supporting the termination decision prior to that decision so that he might seek to provide more information. In fact, the plaintiff was expressly notified that he need not supply any additional information unless he was requested to do so. Thus, the procedures for effectively communicating the plaintiff's case to the Secretary are not present here as they were in Eldridge.[16]
 
 
 43
 Finally, imposing the requirement of a pre-termination hearing would not impose the undue financial or administrative burdens referred to in Eldridge. First, the number of hearings that would be required is not large. The class which plaintiff represents is composed of approximately 3,000 persons. Second, the requirement of a hearing would not impose a continuing burden on the Secretary as it would have done in Eldridge. Here, the burden will terminate once the cases of the rollback recipients are completed. Third, unlike the situation in Eldridge, the Secretary has, as is required by 42 U.S.C. § 1383(c), established an administrative process for providing notice and pre-termination evidentiary hearings to nonpresumptive disability SSI recipients if requested by the recipient. See 20 C.F.R. §§ 416.1336(c) and 416.1425. We do not perceive any undue administrative burden which would be imposed by requiring the Secretary to include the plaintiff and the members of the class with those regular SSI recipients who have a right to a pre-termination hearing.
 
 
 44
 We conclude that the District Court correctly held that due process requires adequate notice of and an opportunity for an evidentiary hearing prior to the termination of the presumptive disability benefits of the plaintiff and the members of the class he represents.[17]
 
 III. RETROACTIVE PAYMENT OF BENEFITS
 
 45
 The plaintiff appeals from that part of the District Court's permanent injunctive decree refusing to order the Secretary to make payments of any benefits terminated prior to a hearing. The District Court's refusal to order this retroactive relief was based on the doctrine of sovereign immunity. On appeal, the plaintiff contends that the sovereign immunity doctrine does not preclude retroactive benefits in this case for two reasons: (1) Section 405(g) constitutes a waiver of sovereign immunity; and (2) this case is within one of the judicially recognized exceptions to the doctrine.
 
 A. Waiver of Immunity
 
 46
 The Supreme Court's recent decision in United States v. Testan, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), controls the question of whether Section 405(g) constitutes a waiver of sovereign immunity with respect to retroactive payment of presumptive disability benefits under the SSI program. Although other cases have held that Section 405(g) constitutes a waiver of sovereign immunity,[18] those cases preceded the Court's decision in Testan and thus are of little authoritative weight. In Testan, two GS-13 government attorneys sought reclassification of their jobs to GS-14 under the Classification Act, 5 U.S.C. § 5101 et seq., contending inter alia that their duties were identical to those of GS-14 attorneys in other agencies. After the Civil Service Commission rejected their claim, the plaintiffs brought an action in the Court of Claims seeking reclassification and backpay. The Court of Claims remanded the case to the Commission, ordering it to reconsider its refusal to reclassify. The Court of Claims also held that, if the Commission found that reclassification was proper, backpay could be awarded. The Supreme Court reversed the Court of Claims decision and held that any award of backpay was barred by sovereign immunity.
 
 
 47
 The jurisdiction of the Court of Claims in Testan was based on a provision of the Tucker Act, 28 U.S.C. § 1491, which provides in part:
 
 
 48
 The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
 
 
 49
 The Court noted that the Tucker Act and this section were only jurisdictional in nature and did "not create any substantive right enforceable against the United States for money damages." United States v. Testan, supra, 96 S.Ct. at 953. The issue was thus whether the federal statutes invoked by the plaintiffs conferred a substantive right to recover money damages from the United States for the period of their allegedly wrongful classification. Finding no such substantive right, the Court held that backpay could not be awarded under the Tucker Act. The Court then expressly rejected the claim that the jurisdictional provisions of the Tucker Act constituted a waiver of sovereign immunity, holding that there must be a federal statute which could fairly be interpreted as mandating the payment of damages by the federal government.
 
 
 50
 The issue here is thus whether, under the federal statutory scheme, the plaintiff was granted a substantive right to retroactive payments of presumptive SSI benefits for the period when such benefits were wrongfully withheld.[19] As with the Tucker Act, Section 405(g) is only jurisdictional in nature and cannot itself constitute a waiver of sovereign immunity or confer the requisite substantive right. Such a waiver and right must be found, if at all, in the statutes creating the SSI program.
 
 
 51
 Pub.L.No.93-256 authorized the Secretary to treat persons such as the plaintiff as presumptively disabled under the Act and to pay benefits on that basis until a determination of ineligibility had been made or until the end of 1974, whichever, occurred first. There can be found no congressional intent to pay benefits after the determination, however, and thus no substantive right to such payments was conferred by statute which would constitute a waiver of immunity when read in conjunction with Section 405(g).
 
 B. Exceptions to Sovereign Immunity
 
 52
 Under the sovereign immunity doctrine as developed by the Supreme Court, a suit is against the sovereign "if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' . . . or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' " Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963), quoting Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), and Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 704, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The Court in Dugan, citing Larson, also recognized that there were two exceptions to the doctrine's applicability: "(1) action by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void." 372 U.S. at 621-22, 83 S.Ct. at 1007. See also Larson v. Domestic and Foreign Commerce Corp., supra, 337 U.S. at 689-90, 69 S.Ct. 1457. The plaintiff contends that since the action of the Secretary in withholding benefits without first affording him the opportunity for a hearing was unconstitutional, this case comes within the second exception to the doctrine. If it were not for a footnote included by the Supreme Court in its opinion in Larson and the implications of that footnote, the plaintiff would likely be correct.
 
 
 53
 In Larson, the Court, after setting out the two general exceptions noted above, added in a footnote:
 
 
 54
 Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property.
 
 
 55
 337 U.S. at 691 n. 11, 69 S.Ct. at 1462. This footnote, the subject of much controversy,[20] has been interpreted by some courts to require applicability of the doctrine in any situation where the relief sought contemplates affirmative action by the government or the disposition of government property. See e. g., Knight v. New York, 443 F.2d 415, 420-21 (2d Cir. 1971); Zapata v. Smith, 437 F.2d 1024, 1025 (5th Cir. 1971). Some courts have avoided the footnote's broader implications by (1) holding that the relief being sought was not "affirmative" in nature since the cessation of unauthorized conduct was the object of the suit, see, e. g., State Highway Commission of Missouri v. Volpe, 479 F.2d 1099, 1123 (8th Cir. 1973); Knox Hill Tenant Council v. Washington, 145 U.S.App.D.C. 122, 448 F.2d 1045, 1052 (1971): or (2) construing the phrase "a suit may fail" in the footnote to not mean that a suit must fail but only that a suit may fail if the relief sought would work an intolerable burden on the government which outweighs any considerations of private harm, see, e. g., Schlafly v. Volpe, 495 F.2d 273, 279-80 (7th Cir. 1974); Washington v. Udall, 417 F.2d 1310, 1317-18 (9th Cir. 1969).
 
 
 56
 We think that footnote 11 precludes retroactive payments from the federal treasury.[21] If footnote 11 is to be limited or restricted, that obligation rests with the Supreme Court. See Knight v. New York, supra, 443 F.2d at 421. The Supreme Court has again recently indicated its reluctance to loosen the federal purse strings in suits for damages in deference to "a particular conception of enlightened governmental policy." United States v. Testan, supra, 96 S.Ct. at 954.In a suit against the United States, there cannot be a right to money damages without a waiver of sovereign immunity, and we regard as unsound the * * * argument that all substantive rights of necessity create a waiver of sovereign immunity such that money damages are available to redress their violation.
 
 
 57
 Id. No permanent harm flows from this deference to sovereign immunity, since the plaintiff and the members of the class can recover all of the benefits withheld should they prevail upon review of the initial determination of ineligibility. See 42 U.S.C. § 1383(b). The government concedes as much in its supplemental brief.
 
 
 58
 We hold that there has been no waiver of sovereign immunity and that this case does not come within the scope of the judicially recognized exceptions to the doctrine. Retroactive relief is therefore barred by sovereign immunity.
 
 IV. PROPRIETY OF CLASS INJUNCTIVE RELIEF
 
 59
 The final issue raised by the government in its supplemental brief is whether under Section 405(g) the District Court had jurisdiction over the class aspects of this action and the authority to order class injunctive relief. The language of the section authorizes the District Court to enter a judgment "affirming, modifying, or reversing" a decision of the Secretary. "It contains no suggestion that a reviewing court is empowered to enter an injunctive decree whose operation reaches beyond the particular applicants before the court." Weinberger v. Salfi, supra, 422 U.S. at 763 n. 8, 95 S.Ct. at 2466. It is argued from this comment that class-wide injunctive relief was not proper. We do not, however, find the argument persuasive.
 
 
 60
 While it is clear that Congress has the authority to limit the equitable powers and discretion of the federal courts in order to implement important federal policy, such limitation will not be found in the absence of a clear legislative command. Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); Hecht Co. v. Bowles, 321 U.S. 321, 330, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Ambiguities must be resolved in favor of that interpretation which affords a full opportunity for equity courts to exercise their traditional practices. Hecht Co. v. Bowles, supra, 321 U.S. at 330, 64 S.Ct. 587. There is no language in Section 405(g) to indicate any intent on the part of Congress to limit the traditional equitable powers of the court. Finding no such clear intent, we conclude that the District Court was authorized to enter an injunctive decree under Section 405(g).[22]
 
 
 61
 Since this action was properly maintainable as a class action under Fed.R.Civ.P. 23[23] and since Section 405(g) conferred jurisdiction on the District Court to hear a claim by each individual member of the class, "Rule 23 provides a procedure by which such power may be exercised in a single appropriate proceeding." Jimenez v. Weinberger, 523 F.2d 689, 694-95 (7th Cir. 1975), petition for cert. filed, 44 U.S.L.W. 3455 (U.S. Feb. 5, 1976) (No. 75-1114). The Supreme Court's comment in Salfi must be viewed in the context that in that case there was no jurisdiction under Section 405(g) over the class members since their claims had not been presented to the Secretary and they had not satisfied one of the statutory requirements for judicial review; hence, the applicants were not before the court in any sense. Here, however, we have determined that there was jurisdiction over the members of the class, and thus they were "applicants before the court" in a properly maintained class action.
 
 V. CONCLUSION
 
 62
 In conclusion, we hold (1) that the District Court had jurisdiction under 42 U.S.C. § 405(g); (2) that the plaintiff and members of the class had a protected property interest in the continued receipt of presumptive disability benefits under the SSI program and that the Due Process Clause of the Fifth Amendment required adequate notice of and an opportunity for a pretermination evidentiary hearing; (3) that the payment of retroactive benefits is precluded by sovereign immunity; and (4) that class-wide injunctive relief is proper under Section 405(g).
 
 
 
 [1]
 The Honorable H. Kenneth Wangelin, United States District Court for the Eastern District of Missouri
 
 
 [2]
 The government contends that the District Court's permanent injunction does not meet the requirements of specificity imposed by Fed.R.Civ.P. 65(d). It notes that material violations of the rule may warrant reversal or vacation of an injunction. See E. W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108 (8th Cir. 1969); 7 J. Moore, Federal Practice P 65.11, at 65-102 (2d ed. 1975). The government argues that, since the District Court merely referred to the stay of its order refusing to accept sovereign immunity as a defense to retroactive payments, it is unclear whether the District Court denied retroactive payments of benefits outright or whether such payments have only been stayed pending some future event
 While we question the specificity of the injunction as it relates to the retroactive payment of benefits, we do not think that reversal or vacation of the judgment is appropriate under the circumstances of this case since we must review the District Court's order of prospective injunctive relief in any event.
 
 
 [3]
 42 U.S.C. § 405(g) provides in part that "(a)ny individual, after any final decision of the Secretary made after a hearing to which he was a party, * * * may obtain a review of such decision by a civil action". This section is made applicable to the SSI program by 42 U.S.C. § 1383(c)(3), which provides:
 The final determination of the Secretary after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Secretary's final determinations under section 405 of this title; except that the determination of the Secretary after such hearing as to any fact shall be final and conclusive and not subject to review by any court.
 
 
 [4]
 Because subject matter jurisdiction may not be conferred on the federal courts by waiver or consent of the parties, we independently examine the jurisdictional question. See Ahrens v. Clark, 335 U.S. 188, 193, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948); Lee v. United States, 501 F.2d 494, 498-99 (8th Cir. 1974). See generally 13 C. Wright & A. Miller, Federal Practice and Procedure § 3522, at 46-49 (1975)
 Additionally, the failure of the plaintiff to allege 42 U.S.C. § 405(g) as a basis for jurisdiction is not fatal. See 5 C. Wright & A. Miller, Federal Practice and Procedure § 1214, at 107 (1969). We also note that in both Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), and apparently in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court found jurisdiction under Section 405(g) despite the fact that neither plaintiff had alleged such jurisdiction in the district court.
 
 
 [5]
 The two other conditions for review under Section 405(g) are:
 (1) that the civil action be commenced within 60 days after the mailing of notice of such decision, or within such additional time as the Secretary may permit, and (2) that the action be filed in an appropriate district court. These two requirements specify a statute of limitations and appropriate venue, and are waivable by the parties.
 Mathews v. Eldridge, 424 U.S. 328, 96 S.Ct. 893, 899 n. 9, 47 L.Ed.2d 18 (1976). As in Salfi and Eldridge, no question as to whether these requirements were satisfied was timely raised below, and we need not consider them here. See Fed.R.Civ.P. 8(c), 12(h)(1).
 
 
 [6]
 The plaintiff does not contend that there has been, and we do not perceive, any deprivation of liberty under the circumstances of this case
 
 
 [7]
 Compare Ryan v. Shea, 525 F.2d 268 (10th Cir. 1975); Buckles v. Weinberger, 398 F.Supp. 931 (E.D.Pa.1975); Saurino v. Weinberger, 396 F.Supp. 992 (D.R.I.1975); Burris v. Weinberger, 385 F.Supp. 412 (M.D.Fla.1974); and Brown v. Weinberger, 382 F.Supp. 1092 (D.Md.1974), aff'd mem., 529 F.2d 514 (4th Cir. 1975), finding a protected property interest, with Ashby v.Weinberger, 402 F.Supp. 1203 (E.D.N.Y.1975); Maher v. Mathews, 402 F.Supp. 1165 (D.Del.1975); and Hannington v. Weinberger, 393 F.Supp. 553 (D.D.C.1975), finding no protected property interest
 
 
 [8]
 In reaching this conclusion, we reject the Secretary's argument that the cessation of payments to plaintiff was not a termination but rather was an initial determination of ineligibility under a new program. See Saurino v. Weinberger, 396 F.Supp. 992, 1000 (D.R.I.1975)
 
 
 [9]
 In December, 1973, plaintiff, along with all other rollbacks, received a notice from the Secretary containing the following information:
 This is a notice that you are eligible (or the individual named above, on whose behalf you applied is eligible) to receive the Supplemental Security Income payment shown above, as provided in Title XVI of the Social Security Act.
 You do not need to file an application to get Supplemental Security Income. A gold-colored U. S. Government check for the amount shown above will come to you automatically about the first day of each month. This check will take the place of the checks you now get from your state or local public assistance office. If your new U. S. Government check is less money than you are getting now, your public assistance office will also send you a check. (emphasis added)
 
 
 [10]
 See note 9, supra
 
 
 [11]
 See Buckles v. Weinberger, 398 F.Supp. 931, 940-41 (E.D.Pa.1975); Saurino v. Weinberger, 396 F.Supp. 992, 1002 (D.R.I.1975)
 
 
 [12]
 The Commissioner of Social Security, James B. Cardwell, wrote to Representative Wilbur Mills, Chairman of the House Committee on Ways and Means, on December 2, 1974, indicating that the agency intended to continue payments of the benefits since such action was consistent with the legislative intent. See Buckles v. Weinberger, 398 F.Supp. 931, 943-44 (E.D.Pa.1975)
 
 
 [13]
 See Ryan v. Shea, 525 F.2d 268, 274-75 (10th Cir. 1975); Buckles v. Weinberger, 398 F.Supp. 931, 943-45 (E.D.Pa.1975). Contra Ferguson v. Weinberger, 389 F.Supp. 759, 761-62 (D.Mont.1975)
 
 
 [14]
 The Court noted that the recipient periodically was required to complete a detailed questionnaire on the entitlement issue, that the medical information critical to the decision was usually secured from medical sources which are likely to be able to effectively communicate through written documents, that the recipient or his representative had full access to the information relied upon, and that the recipient was provided with a summary of the reasons for and evidence supporting the tentative assessment prior to any cut-off of benefits with the opportunity to submit additional written evidence or arguments. Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 908, 47 L.Ed.2d 18 (1976)
 
 
 [15]
 Mathews v. Eldridge, 424 U.S. 342, 96 S.Ct. 893, 906 n. 27, 47 L.Ed.2d 18 (1976)
 
 
 [16]
 We also note from the record that the administrative reversal rates on these terminations of presumptive disability benefits is about thirty percent. While "statistics rarely provide a satisfactory measure of the fairness of a decision-making process", this information is relevant to our decision. Mathews v. Eldridge, 424 U.S. 345-349, 96 S.Ct. 893, 908-09, 47 L.Ed.2d 18 (1976). We place more reliance on such information in this case than the Supreme Court did in Eldridge since there, unlike this case, the system operated on an open filed basis with the opportunity for the recipient to provide more information before the initial termination. See note 14, supra
 
 
 [17]
 Several pre-Eldridge district court opinions engaged in a similar analysis and reached the same conclusion. See Burris v. Weinberger, 385 F.Supp. 412, 414-15 (M.D.Fla.1974); Brown v. Weinberger, 382 F.Supp. 1092, 1098-99 (D.Md.1974), aff'd mem., 529 F.2d 514 (4th Cir. 1975). Cf. Lyons v. Weinberger, 376 F.Supp. 248, 260-62 (S.D.N.Y.1974). But cf. Ashby v. Weinberger, 402 F.Supp. 1203, 1206 (E.D.N.Y.1975)
 
 
 [18]
 See Jimenez v. Weinberger, 523 F.2d 689, 702 (7th Cir. 1975), petition for cert. filed, 44 U.S.L.W. 3455 (U.S. Feb. 5, 1976) (No. 75-1114); Knight v. Celebrezze, 238 F.Supp. 897, 900 (W.D.S.C.1965); Cohn v. Federal Security Administration, 199 F.Supp. 884, 885 (W.D.N.Y.1961)
 
 
 [19]
 The government concedes that prospective injunctive relief which results in the payment of benefits is not barred by sovereign immunity. This is because prospective payments are the necessary result of compliance with the terms of the decree ending the unlawful conduct. See Edelman v. Jordan, 415 U.S. 651, 667-68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)
 
 
 [20]
 See, e. g., Cramton, Nonstatutory Review of Federal Administrative Action. The Need for Statutory Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant, 68 Mich.L.Rev. 387, 404-11 (1970); Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv.L.Rev. 1, 29-39 (1963)
 
 
 [21]
 In State Highway Comm'n of Missouri v. Volpe, 479 F.2d 1099, 1123 (8th Cir. 1973), we held that injunctive relief in an "impoundment" case was not "affirmative" since it would result in "release of funds * * * only to the extent that Congress has already authorized them to be appropriated and expended." In this case, however, to cease unauthorized action (the discontinuance of SSI benefits without notice and a hearing) would not automatically make benefits for the pre-injunction period available; it would require affirmative action to produce essentially compensatory, rather than remedial, payments
 
 
 [22]
 This question is now before the Supreme Court in Norton v. Mathews, --- U.S. ----, 96 S.Ct. 2771, 48 L.Ed.2d ---, argued January 13, 1976. See 44 U.S.L.W. 3409 (Jan. 20, 1976). See also Jimenez v. Weinberger, 523 F.2d 689, 694 (7th Cir. 1975), petition for cert. filed, 44 U.S.L.W. 3455 (U.S. Feb. 5, 1976) (No. 75-1114)
 
 
 [23]
 The District Court made no explicit finding that this action was maintainable as a class action pursuant to Fed.R.Civ.P. 23. The plaintiff did file a motion to proceed as a class action on January 20, 1975, but the court made no explicit order with respect to this motion other than its order in the permanent injunction issued on February 26, 1975, which denied "all other motions of the parties * * * as moot." Because it would be inconsistent with the District Court's injunctive decree which ordered class relief, we do not construe this "catch-all" order to deny class relief. Instead, we construe this situation to be one where the District Court failed to properly make an order finding the action maintainable as a class action as is required by Fed.R.Civ.P. 23(c)(1). In such situation where the issue of the appropriateness of the action as a class action has not been considered in the district court, "the better practice, for reasons of judicial economy, (is) for the appellate court to make such a determination on the basis of the record before it, rather than remanding for a decision on this question." Caldwell v. Craighead, 432 F.2d 213, 216 (6th Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1617, 29 L.Ed.2d 123 (1971). See also Locke v. Board of Public Instruction of Palm Beach County, 499 F.2d 359, 365 (5th Cir. 1974). On the basis of the record here, this action is properly maintainable as a class action pursuant to Fed.R.Civ.P. 23(b)(2). See Buckles v. Weinberger, 398 F.Supp. 931, 947-48 (E.D.Pa.1975); Saurino v. Weinberger, 396 F.Supp. 992, 993 n. 1 (D.R.I.1975). See also Ryan v. Shea, 525 F.2d 268, 275 (10th Cir. 1975)