**Marjorie McAVOY, Plaintiff,**

v.

**Margaret HECKLER, Secretary of the Department of Health and Human Services, Defendant.**

No. CV83–L–144.

United States District Court, D. Nebraska.

March 28, 1984.

**1452**

C.A. Brady, Lincoln, Neb., for plaintiff.

Sally R. Johnson, Asst. U.S. Atty., Lincoln, Neb., for defendant.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

This appeal from a termination of supplemental security income benefits presents an issue not previously addressed in a published decision in the Eighth Circuit and upon which other circuits have disagreed: Whether the Secretary may terminate benefits of a person converted to the SSI program under 42 U.S.C. sec. 1382c(a)(3)(E) (effective Jan. 1, 1974) by finding merely that the person's current condition fails to satisfy the disability definition under the prior state plan or must also find improvement in condition since the state's determination of disability.

In 1960, at the age of 23, Marjorie McAvoy was found by the Nebraska Division of Public Welfare to be permanently and totally disabled because of a mental disability. In 1974 she was converted from the state disability plan to the federal SSI program under the "grandfather clause," 42 U.S.C. sec. 1382c(a)(3)(E).

In 1982 a disability examiner informed her that her benefits would be terminated as of April 1982 because current medical evidence showed her impairment not to be severe under the federal standards. The examiner found that because she did not meet the federal standard she also did not meet the prior state standard.

The Administrative Law Judge reached the same conclusion after a hearing. He found that the original disability was established due to an emotional disorder, that she continues to suffer from "a mixed-type of personality disorder with dependant and passive-aggressive features," but that her "emotional impairment has not been manifested by symptomotology of such severity as would have significantly affected her ability to perform basic work-related functions." Although "there has been a significant deterioration in her personal habits, this has been associated with a mere 'lack of motivation.'" Therefore, the ALJ found

that her impairment did not render her disabled under the federal standard. Similarly, he found that such other complaints as nervousness manifested by constant diarrhea, occasional vomiting, and a greasy moist feeling over her skin associated with extreme body odor was not "of such intensity, or of such frequency or duration, as would prevent her from performing substantial and gainful work activity." The ALJ then set out what he found to be the definition of disability under the Nebraska Aid to the Permanently and Totally Disabled State Plan and concluded without further discussion that she was no longer disabled under that definition. No specific source was cited for the definition, nor was the time period covered by the definition revealed. At no point did the ALJ address the question of improvement in McAvoy's condition since 1960.

The Appeals Council declined to review the ALJ's decision, and the present appeal was taken.

In nonconversion termination cases involving only the federal disability standard, several of the circuit courts of appeal, including the Eighth, have applied principles of administrative res judicata in adopting the following rule:

> "[O]nce having found a disability, the Secretary may not terminate the benefits without substantial evidence to justify so doing. This will normally consist of current evidence showing that the claimant has improved to the point of being able to engage in substantial gainful activity; but it might also consist of evidence that claimant's condition is not as serious as was at first supposed."

*Miranda v. Secretary of Health, Education* and *Welfare*, 514 F.2d 996, 998 (1st Cir.1975). *Accord, Weber v. Harris*, 640 F.2d 176, 178 (8th Cir.1981); *Simpson v. Schweiker*, 691 F.2d 966 (11th Cir.1982); *Cassiday v. Schweiker*, 663 F.2d 745 (7th Cir.1981). As *Miranda* and *Weber* pointed out, the second prong of the test allows the Secretary to compare the current condition with the relative strengths or weaknesses of the evidence on which the prior determination was made, at least where the condition was difficult to diagnose or benefits

were granted on the basis of a tentative diagnosis.

The burden of persuasion on the disability issue never shifts from the claimant. *Weber v. Schweiker, supra* at 177. However,

> "once the claimant has introduced evidence that his or her condition remains essentially the same as it was at the time of the earlier determination, the claimant is entitled to the benefit of a presumption that his or her condition remains disabling.... The presumption of continuing disability does not affect the ultimate burden of proof. It imposes on the Secretary only the burden of going forward with evidence to rebut or meet the presumption."

*Kuzmin v. Schweiker*, 714 F.2d 1233, 1237 (3d Cir.1983). *Accord Patti v. Schweiker*, 669 F.2d 582 (9th Cir.1982); *Dotson v. Schweiker*, 719 F.2d 80 (4th Cir.1983); *Crosby v. Schweiker*, 650 F.2d 777 (5th Cir.1981). The presumption is not that the condition continues, but that the condition, once it has been shown still to exist, presumptively continues to be disabling. *Kuzmin v. Schweiker, supra* at 1237. This rule is predicated on "[b]asic principles of fairness as well as the need to provide both the appearance and fact of consistency in the administrative process ...." *Id.* "After a final determination of disability, if a termination of benefits is effected without a showing of either improvement or newly discovered evidence, such a termination must necessarily be based on whim, caprice or an impermissible relitigation of facts and determinations already finally decided." *Musgrove v. Schweiker*, 552 F.Supp. 104, 106 (E.D.Pa.1982). *Accord Simpson v. Schweiker, supra* at 969.

A version of the improvement rule was applied to termination of a grandfatheree's benefits in *Finnegan v Matthews* [sic], 641 F.2d 1340 (9th Cir.1981). The court reversed a termination where no finding of medical improvement or error in the prior state determination was made.

> "The sole function of a grandfather clause is to prevent the harsh and often

unfair operation of a statutory change. In the case at bar, the statutory revision threatened to deprive individuals of the continued right to receive disability benefits. The unfairness which could have resulted from the statutory change—the undesired potential side effect of the new disability program—would have been the discontinuance of benefits to former recipients prompted solely by a change in the rules of the game and undertaken in the absence of any improvement in their disabling condition. This harsh side effect was averted through the inclusion of the grandfather clause.... [T]he grandfather clause was designed to qualify automatically those included within its coverage for SSI benefits, and correlatively, to exempt grandfatherees from the requirement of undergoing 'initial determinations' of eligibility by HEW. Therefore, benefits to a grandfatheree must not be terminated absent proof of a material improvement in his medical condition or of the commission of a clear and specific error during the prior state determination."

*Id.* at 1346, 1347. An example of a clear and specific error would be proof that the previous state determination had been materially influenced by an incorrect medical report. *Id.* at 1345 n. 7. "On the other hand, the mere fact that an ALJ's independent assessment of a grandfatheree's eligibility under the former state statute differs from the state's former assessment of eligibility is not sufficient to find that clear error had been committed during the earlier determination." *Id.*

The court based the rule on the words of the statute:

"It is relatively easy to locate the former state statute based on which a grandfatheree was ruled to be 'disabled;' however, even the wisdom of hindsight will often be insufficient to allow an ALJ to understand fully how a state disability statute had been routinely interpreted and applied by the relevant administrators. Hence, it is indeed difficult, if not impossible, for an ALJ to properly assess whether a recipient is 'continuously disabled' under the 'complete' state standard. An ALJ's inquiry must therefore focus on whether a clear and specific error had been committed during the previous state determination of eligibility and on whether the recipient's medical condition has materially improved. Absent a finding of clear and specific error in the earlier determination a recipient must logically have been 'disabled under a state plan;' absent a finding of subsequent material medical improvement a recipient must logically still be disabled 'as so defined.' "

*Id.* at 1344–45.

The only decision outside of the Ninth Circuit to have considered the grandfatheree termination issue directly, *Wheeler v. Heckler,* 719 F.2d 595, *rehearing denied,* 724 F.2d 262 (2d Cir.1983), disagreed with *Finnegan.* The district court had adopted a modified version of the *Finnegan* "improvement or error" rule, but expanded it to allow termination where the claimant's employability had materially improved because of changes in medical technology or the economy, as well as because of changes in his medical condition. *Wheeler v Schweiker,* 547 F.Supp. 599, 610 (D.Vt. 1982). Accord Kuzmin v. Schweiker, supra at 1238 n. 2; Siedlecki v. Schweiker, *563 F.Supp. 43, 45 & n. 2 (W.D.Wash.1983). However, the appeals panel discounted the concern shown by the district court and by the Ninth Circuit about the ascertainability of the complete state standard.*

"Whatever difficulties may arise from the unavailability of some administrative decisions, we see no basis for departing from the Congressional mandate that the standard of the prior state law be applied where advantageous to the claimant. The standard is set forth in the state plan and in implementing regulations. Perhaps some administrative or judicial decisions can be located to give the standard a more refined meaning. Whether or not that occurs, SSA and [the state agency performing disability reviews] will simply have to do their best with the available materials ...."

719 F.2d at 601. *Finnegan's* concern about protecting grandfatherees against the risk that the Secretary may apply the prior state standard but reach a different conclusion was not Congress's concern, or else it would have legislated such a standard explicitly. *Id.*

> "Such a standard would have been difficult to administer since it would require inquiry in each case as to both the details of the claimant's condition and the regularity of the proceedings at the time of the initial disability determination.... Instead, Congress preferred an assessment of only the grandfatheree's current condition, requiring a retrospective look only to ascertain the prior state standard in those situations where it was more beneficial to the claimant than the new federal standard. It is only the prior state standard, and not the claimant's disability status under that standard, that has been grandfathered."

*Id.*

In denying a rehearing, the court explained that it was not foreclosing consideration of any role for the concept of "medical improvement" in disability termination cases, and noted that thus far it had not resolved this issue and did not do so in the present case. 724 F.2d at 263.

Thus, *Finnegan* applied an improvement rule, not for the reasons behind use of a similar rule in nonconversion cases (administrative res judicata), but because of the difficulty of ascertaining the prior state standard. And *Wheeler* rejected the Ninth Circuit's acataleptic view in favor of applying the prior state standard as best it can be determined, but left dangling the question of whether an improvement standard nonetheless might be appropriate once the record is tested for substantial evidence.

A third way of looking at the problem is to view the grandfather clause as a recognition of the competency of state welfare officials to assess accurately the condition of claimants under the prior state plans and to categorize claimants appropriately under state-created disability definitions. When Congress, in October 1972, passed the original Social Security Act amendments which mandated conversion of state disability recipients to the federal SSI program and delayed the effective date until January 1, 1974, concern arose about the possibility of wholesale dumping of state disability applicants upon the state rolls during the interim in anticipation of the conversion. Therefore, the day before the amendments were to take effect, Congress passed a "rollback" amendment which restricted the class of grandfatherees, with their automatic federal eligibility, to those who had received state aid for at least one month prior to July 1973. Rollback cases, those claimants going on the state rolls later than this, were deemed to be presumptively disabled until an initial determination could be made under the federal standard. *See Johnson v. Mathews*, 539 F.2d 1111, 1114–15 (8th Cir.1976); *Coats v. Schweiker*, 552 F.Supp. 902, 903–04 (E.D. Wash.1982). It follows that Congress was not as concerned that those placed on state rolls earlier might have been put there improperly as it was that those put on during the rollback period might have been. These state recipients were to come onto the federal rolls without further question about their eligibility, other than the periodic review of continuing disability to which all federal beneficiaries were subject. Even then, in a subsequent review the grandfatherees were entitled to whatever advantages the prior state standard might afford them.

Administrative res judicata, in a strict sense, would appear to bear little relevance to federal review of a state decision, but the principles akin to full faith and credit which are reflected in the grandfather clause may produce the same result. The clause would not have the effect of giving finality to the prior state determinations unless the Secretary is required to recognize in them the same degree of finality and presumptive validity which the courts require of her own prior determinations.

The rule most in line with the intent of the grandfather clause and most consistent with other termination cases would be one blending *Finnegan, Wheeler, Weber,*

and *Kuzmin.* That is, the benefits of a grandfatheree may not be terminated unless the Secretary finds, upon substantial evidence and applying the complete prior state disability standard in effect in October 1972 as well as it can be ascertained, that (1) the beneficiary's medical condition has improved since the time of his last disability determination under the state plan to the point that he no longer is permanently and totally disabled under the state definition, or (2) current medical evidence reveals that, although the beneficiary's condition has not actually improved, it was difficult to diagnose or was tentatively determined to be disabling at the time of the state finding and is not as serious as was originally supposed, or (3) although the beneficiary's medical condition has not improved, changes in the economy or the workplace have enhanced the beneficiary's employability to the point that he is no longer disabled under the state plan, or (4) the state disability definition in effect in October 1972 was more restrictive than that used in the prior state determination and an initial determination of the beneficiary's current condition shows he is not eligible under the 1972 state definition. The effect on the fourth option of state law concerning the permissibility of reevaluation of a prior disability determination after an intervening change in the eligibility standard is not at issue here because there is no indication in the record that the state standard changed from 1960 to 1972.

It is apparent that the ALJ failed to follow the correct legal standard in analyzing the evidence. His analysis revolved about the federal disability standard. It is unclear whether the ALJ viewed the different language of the state standard quoted in his opinion as not different in effect from the federal test or merely omitted the reasoning behind his conclusion that McAvoy did not satisfy the state test. Nor is there any basis for reviewing the assertion that the quoted state standard is the appropriate one for this case. Ascertainment of the complete prior state disability definition, including rules and regulations, is a matter best left to the Secretary, but the record should include some sort of indica-tion of the sources used. This record is deficient in that respect, and the parties' briefs have been no more helpful.

If the quoted definition was in effect in both 1960 and October 1972, then the 1960 disability determination by the state agency is entitled to the same deference accorded prior determinations in purely federal termination cases, and the improvement rule of *Weber* and *Kuzmin* applies, requiring comparison of current medical condition and employability with that revealed in the record of the prior state determination. The ALJ failed to discuss the 1960 evidence and made no finding of either improvement or deficiency in the 1960 determination.

■ Because the "improvement or error" rule applies to grandfatheree termination cases, it follows that the related rules on shifting the burden of going forward with the evidence also should apply. As such, if the record contains evidence showing that the medical condition which formed the basis of the prior state determination continues to exist, then a presumption arises that the condition continues to be disabling and the beneficiary has made out a prima facie case for continuation of benefits. Accordingly, the Secretary must counter this presumption by showing medical improvement to the point of nondisability under the same standard, or a change in the economy or workplace which would enhance the beneficiary's employability to the point of nondisability under the state standard, or a material intervening change in the state standard which would allow a reevaluation under the new standard, or current medical evidence revealing that the medical condition, though unchanged, is not as serious as was supposed at the time of the prior state ruling.

■ The record shows that the mental impairment upon which the state based its 1960 determination still exists. The ALJ found that McAvoy continues to suffer from "a mixed-type of personality disorder with dependent and passive-aggressive features," which Dr. Anthony, a psychiatrist who interviewed McAvoy in April 1982, had offered as a diagnosis. In her June 28,

1982, report, Clinical Social Worker Joyce Page said, among other things, that McAvoy suffers from a "functional, non-psychotic disorder of borderline personality disorder," and in her September 20, 1982, followup letter she explained in detail the observed behavior supporting that diagnosis. By comparison, a staff physician with the University of Nebraska Psychiatry Unit, Dr. Sjogren, reported in 1960 a diagnosis of "[p]ersonality pattern disturbance, inadequate personality"; this was based on treatment at the Unit for several months in 1959. McAvoy was moved from the University facility to the Nebraska State Hospital for two more months in 1959. The treating physician there, Dr. Kaarma, reported a diagnosis of "Chronic Brain Syndrome with metabolic disorder with behavioral reaction." Among his observations: "Slow in thinking and movements. Emotionally unstable. At times mildly depressed. Somatic complaints. Temper tantrums. Memory fairly good. General knowledge fairly limited. I.Q. 83. No evidence of delusions or hallucinations." Both Dr. Anthony in 1982 and a caseworker in 1959 reported her intellectual capacity to be in the "dull-normal" range. The observations about work experience, education, appearance, domestic interests, reading skills, hygiene, and emotional fluctuations which caseworkers reported in 1959 and 1960 were reiterated to a large extent by Page and Anthony in 1982. However, Page's observations on these points portray a woman whose mental health has deteriorated over the span of 22 years. The ALJ discounted the "significant deterioration" in personal habits as being "associated with a mere 'lack of motivation.'" However, the source of this finding, Page, emphasized that the motivation deficiency was a symptom of her mental problem. The caseworker's report in 1960 also had referred to a lack of inclination to do housework, an inability to take responsibility, and undependability in her attempts to perform work.

Therefore, McAvoy has made out a prima facie case of continuing disability under the prior state standard. The record lacks evidence showing improvement to the point of nondisability. If anything, the record shows deterioration, particularly when McAvoy's unchanged or worsened mental condition is considered together with her snowballing health problems. Since 1960 her obesity problem has worsened, she has begun to suffer from diabetes, she has developed an extreme body odor (possibly caused by diabetes) which further hampers her ability to work with others, and she was hospitalized in 1982 for treatment of enterocolitis, diabetes, and thrombophlebitis. After the October hospitalization, Dr. Wiedman, who had treated her since 1974, recommended that she be discharged to custodial care because she "has not been able to function on the outside." He wrote on October 12, 1982:

"She continued to be emotionally and mentally unable to care for herself. She has continued to have evidence of totally inadequate hygiene. She has been a latent diabetic due to her obesity. It is felt that the patient has a psychiatric disorder, a type unknown; but she is unable to function adequately by herself. There has been no sign of improvement in the last eight years. The diabetes has progressed to the point where she is now going to require constant nursing supervision. Therefore, I feel that she is disabled from a mental and functional standpoint."

Neither is there any evidence or finding which might rebut the presumption of continuing disability under the other options discussed above. Therefore, the decision of the ALJ terminating benefits must be reversed. Because of the basis for this disposition, there is no need to address the sufficiency of the evidence concerning the determination of nondisability under the federal standard.